UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CHRISTOPHER O'NEILL,

                            Petitioner,

    v.

RENEE BAKER, *et al.*,

                         Respondents.

Case No. 3:11-cv-00901-MMD-CLB

ORDER

## I. SUMMARY

Petitioner Christopher O'Neill's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is before the Court for adjudication of the merits of his remaining claims. As further explained below, the Court denies Petitioner's habeas petition, but grants him a certificate of appealability for Ground One Part A and Ground Two, and directs the Clerk of Court to enter judgment accordingly.

## II. BACKGROUND

Petitioner's convictions are the result of events that occurred in Washoe County, Nevada on September 22, 2004. (ECF No. 14-6.) In its order affirming Petitioner's second state habeas appeal, the Nevada Supreme Court described the crime, as revealed by the evidence at Petitioner's trial, as follows:

> The jury was presented with evidence that appellant possessed two forged checks and yellow pages listing check-cashing services and that another forged check and ten blank checks from the same account were found in an envelope in his car. [Petitioner] told the police that he received the checks as collateral for work that he had done, but the account owner denied writing or authorizing the checks.

(ECF No. 22 at 4.)

On June 7, 2005, a jury found Petitioner guilty of three counts of possession of a forged instrument. (ECF Nos. 14-24, 14-25, 14-26.) On August 25, 2005, Petitioner was adjudicated a habitual criminal, and was sentenced to life with the possibility of parole, with eligibility for parole after ten years, on all three counts, to be served concurrently. (ECF No. 15-2.) Petitioner appealed, and the Nevada Supreme Court affirmed Petitioner's judgment of conviction and the adjudication of habitual criminality but remanded the "matter for entry of an amended judgment of conviction vacating the special sentence of lifetime supervision." (ECF No. 15-22 at 17-18.) Remittitur issued on April 3, 2007. (ECF No. 15-23.) An amended judgment of conviction was filed on April 5, 2007. (ECF No. 15-24.)

On April 30, 2007, Petitioner filed his first state habeas petition. (ECF No. 15-25.) Petitioner filed a counseled, supplemental petition on December 28, 2007. (ECF No. 16.) Following an evidentiary hearing, the state district court denied the petition on July 21, 2010. (ECF Nos. 17-5, 17-17, 18-7, 18-9, 18-13.) The Nevada Supreme Court affirmed the denial of the petition on November 17, 2011, and remittitur issued on December 13, 2011. (ECF Nos. 21-5, 21-7.)

On June 6, 2007, Petitioner moved for a new trial, which the state district court denied. (ECF Nos. 15-29, 15-32.) On November 19, 2008, the Nevada Supreme Court affirmed the denial, and remittitur issued on December 16, 2008. (ECF Nos. 22-5, 22-6.)

On June 25, 2010, Petitioner moved to correct or modify his sentence, which the state district court denied on September 1, 2010. (ECF Nos. 18-10, 19-13.) The Nevada Supreme Court affirmed the denial on February 9, 2011, and remittitur issued on March 7, 2011. (ECF Nos. 20-21, 20-26.)

On August 24, 2010, Petitioner filed his second state habeas petition. (ECF No. 19-9.) The state district court dismissed the petition on October 19, 2011. (ECF No. 20-40.) The Nevada Supreme Court affirmed the dismissal of the petition on June 13, 2012, and remittitur issued on July 10, 2012. (ECF Nos. 22, 22-1.)

Petitioner dispatched this federal habeas petition on or about December 3, 2011. (ECF No. 4.) Petitioner filed a counseled, first-amended petition on November 21, 2012. (ECF No. 13.) Respondents moved to dismiss the first-amended petition on November 7, 2013. (ECF No. 44.) The Court determined that Grounds 1(B), 5(A) and 5(B) of the first-amended petition were unexhausted and Grounds 1(A), 1(C), and 3 were exhausted. (ECF No. 56.) Petitioner moved for a stay and abeyance of the unexhausted grounds— Grounds 1(B), 5(A), and 5(B). (ECF No. 57.) The Court granted that request and administratively closed this action. (ECF No. 62.)

Petition filed a third state habeas petition on May 19, 2015. (ECF No. 64-1.) The state district court dismissed the petition based on a failure of Petitioner to file a response to the motion to dismiss. (ECF No. 64-7.) The Nevada Court of Appeals affirmed the denial on July 27, 2016, and remittitur issued on August 22, 2016. (ECF No. 64-16, 64-17.)

On October 3, 2016, Petitioner moved to reopen his federal habeas case. (ECF No. 63.) The Court granted the request. (ECF No. 66.) Respondents moved again to dismiss the first-amended petition. (ECF No. 68.) The Court dismissed Grounds 5(A) and 5(B) as procedurally barred, deferred a decision on Ground 1(B), and found Ground 6(A) to be exhausted. (ECF No. 74.) Respondents answered the remaining claims in the first-amended petition on May 2, 2018. (ECF No. 76.) Petitioner replied on July 30, 2018. (ECF No. 78.)

In the remaining grounds for relief, Petitioner asserts the following violations of his federal constitutional rights:

> 1A. His trial counsel failed to communicate and investigate the case prior to trial.
> 1B. His trial counsel failed to challenge the admissibility of the handwriting expert's testimony.
> 1C. His trial counsel failed to timely move to suppress the evidence seized by his parole officers.
> 2. The prosecution failed to disclose exculpatory, material evidence.

3.    The state district court failed to conduct an appropriate inquiry into his motion to replace his appointed counsel with new appointed counsel.

4.    The state district court failed to appropriately canvass him regarding his request to represent himself.

6A.   His habitual criminal sentence was improper because the state district court did not find the required number of prior convictions before imposing the enhanced sentence.

6B.   His habitual criminal sentence was improper because the sentencing analysis conducted by the state district court should have been conducted by a jury.

(ECF No. 13.)

## III.    LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## IV.    DISCUSSION

### A.    Ground One

In Ground One, which contains three subparts—A, B, and C—Petitioner argues that his trial counsel was ineffective. In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's

burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel, under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the United States Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*[ *v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'").

The *Strickland* standard is also utilized to review appellate counsel's actions: a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and then "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

### 1. Part A

In Ground One Part A, Petitioner alleges that his federal constitutional rights were violated when his trial counsel failed to communicate with him and present a full defense at trial. (ECF No. 13 at 19.) Petitioner elaborates that as a result of his trial counsel's deficiencies, he was unable to present the following defense regarding his possession of the forged checks: he ran a landscaping business and Geraldine Mesker, who hired him to do landscaping work, gave him the checks, which belonged to her roommate, as collateral while she came up with the money to pay him. (*Id.* at 22.) In addition to failing to adequately investigate Mesker and present her as a witness in order to support this defense, Petitioner asserts that his trial counsel failed to investigate or question Brent Cooper, Petitioner's parole officer, about his history with Petitioner. (*Id.* at 24-25.)

In Petitioner's first state habeas appeal, the Nevada Supreme Court held:

> [Petitioner] argues that counsel was ineffective for not presenting to the jury his defense that he was merely holding the forged check as collateral without the intent to utter it. Specifically, [Petitioner] claimed that the roommate of the person whose checks were forged gave [Petitioner] one check to hold as collateral for work he had done at the house and the roommate must have forged the checks. [Petitioner] further claimed that he would have been acquitted had counsel presented to the jury fingerprint evidence that he had only touched the one check, a handwriting expert to prove the roommate—not [Petitioner]—had forged the checks, and the roommate to confirm [Petitioner]'s version of events. [Petitioner] failed to demonstrate prejudice. The district court found that [Petitioner] presented no credible evidence that he had performed any work. Moreover, [Petitioner] presented no fingerprint or handwriting experts to support his claims. Because [Petitioner] did not demonstrate by a preponderance of the evidence the facts underlying his claim, we conclude that the district court did not err in denying this claim.

> Third, [Petitioner] argues that counsel was ineffective for failing to communicate with him and, as a result, counsel failed to file the motion to suppress or to present the check-as-collateral defense. For the reasons stated above, [Petitioner] failed to demonstrate prejudice. We therefore conclude that the district court did not err in denying this claim.

(ECF No. 21-5 at 4-5.) The Nevada Supreme Court's rejection of Petitioner's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established federal law.

Petitioner testified at the post-conviction evidentiary hearing that Mesker gave him the checks as payment for work he did at her residence: painting, cleaning the backyard, emptying the garbage, and transporting items to a storage unit. (ECF No. 17-5 at 10, 18-21.) Petitioner explained that he "knew it was a crap check when [Mesker] gave it to [him]" but he "had no intention of cashing the damn thing." (*Id.* at 51.) Accordingly, Petitioner's defense was that he was "a legitimate businessman holding property for work done." (*Id.* at 99; *see also* ECF No. 21-18 at 2 (business license issued by the City of Sparks to Petitioner on May 21, 2004 for his business specializing in yard services).) Petitioner testified that he thought that his trial counsel knew about this defense, in part, but did not know whether his trial counsel knew about his business. (ECF No. 17-5 at 23-24.)

Petitioner testified that he had communication issues with his trial counsel: "I never talked to [trial counsel]. [Trial counsel] never came to see me, refused all my phone calls, wouldn't answer any letters. I never talked to the guy." (*Id.* at 22.) Petitioner elaborated that he tried to speak with his trial counsel during three or four pretrial hearings, "and every time [he] did [trial counsel] would either shush [him] or a deputy would shush [him]." (*Id.* at 22-23, 92.) Petitioner's trial counsel would then falsely promise to visit him. (*Id.* at 23.) Petitioner even requested that his mother call his trial counsel because his trial counsel's office "kept hanging up on [him]." (*Id.* at 27; *see also* ECF No. 17-5 at 148-149 (testimony of Elizabeth Logan, Petitioner's mother, during the post-conviction evidentiary hearing that "[she] tried numerous times to reach [Petitioner's trial counsel]" and the response she received "was only to inform [her] that he didn't need to talk to [Petitioner] before going to trial and he didn't need to talk to any other witnesses or anybody else that he didn't feel was important to the case").) Petitioner's trial counsel's only visit to the jail to meet Petitioner took place three days

before the trial commenced and lasted for five minutes. (ECF No. 17-5 at 49; *see also* ECF No. 21-27 at 2 (Washoe County Detention Facility visitor report showing Petitioner's trial counsel visited him on June 3, 2005).)

Petitioner testified that if his trial counsel had spoken to him, he would have told his trial counsel about his defense, his business, an employee who could have testified as a witness, and his issues with Officer Cooper, who was extorting him for money. (ECF No. 17-5 at 30, 48, 51, 118.) Petitioner testified that his trial counsel may have learned some of this information when Petitioner tried to discuss things during pretrial hearings, but because he kept getting "shushed," he was not sure what his trial counsel actually heard. (*Id.* at 56.) Petitioner's trial counsel informed Petitioner that he "didn't need to talk to [him] to represent [him]" and "didn't need to speak to any witnesses." (*Id.* at 64.)

Petitioner's trial counsel testified at the post-conviction evidentiary hearing that he would sometimes speak to Petitioner when he called and that he believed he spoke with Petitioner six or seven times, excluding court appearances, before his visit to the jail three days before trial. (ECF No. 17-17 at 136, 150, 153, 162.) Petitioner's trial counsel explained that Petitioner's story varied slightly each time they spoke and that he did not speak to Petitioner every time he called because he thought Petitioner was "crazy like a fox." (*Id.* at 154, 162.) Petitioner's trial counsel testified about his theory of the case: "I had an issue with the possession of the check, and I had an issue with Ms. Mesker not being present." (*Id.*) Petitioner's trial counsel elaborated that he used an "empty chair theory," arguing that the checks were written by somebody else. (*Id.* at 159-60.) Petitioner's trial counsel testified that he remembered Petitioner "claiming there was some work he had done for somebody that had paid him those checks," but did not remember Petitioner saying that he was a landscaper or had a business license. (*Id.* at 148-49.)

Regarding Mesker, Petitioner's trial counsel did make some effort to try and find her, but he never met her and did not subpoena her because there was nothing that led him to believe that her testimony would be important. (*Id.* at 141-43, 160.) Petitioner's

trial counsel also explained that although Petitioner mentioned that Mesker was the one that gave him the check, "[s]ometimes [he] actually prefer[s] not to have the other person there because it gives [him] something to wave around in front of the jury. (*Id.* at 143.) Petitioner's trial counsel explained that Mesker's testimony could have been risky if she failed to accept responsibility for writing the checks. (*Id.* at 160.) Petitioner's trial counsel testified that he did not remember a conversation with Petitioner that Mesker was present at the trial. (*Id.* at 152.)

Regarding Officer Cooper, Petitioner's trial counsel did not remember Petitioner saying that Officer Cooper was extorting money from him. (*Id.* at 141.) Petitioner's trial counsel made a telephone call to inquire about Officer Cooper's actions, but he did not learn anything about Officer Cooper supporting any allegations that Petitioner made against him. (*Id.* at 153.) Because he did not have any substantiated evidence that Officer Cooper was a dirty officer at the time of trial, as Petitioner claimed, Petitioner's trial counsel did not question Officer Cooper about issues with his testing and reporting: "if I don't have some solid evidence, I am not going to go up there and besmirch some person's character without the appropriate backup." (*Id.* at 146.)

Defense counsel has a duty to "consult with the defendant on important decisions and to keep the defendant informed of important developments." *Strickland*, 466 U.S. at 688. Defense counsel also has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. And "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* This investigatory duty includes investigating the defendant's "most important defense," *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994), and investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *See Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999). When the record demonstrates that trial counsel was well-informed, and the defendant fails to provide what additional

information would have been gained by the investigation he now claims was necessary, an ineffective assistance claim fails. *See Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986). "Moreover, ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Id.*

Although there does not appear to be a dispute that Petitioner's trial counsel only visited Petitioner in the jail on one occasion and that discussions during pretrial court appearances were stifled, it is unclear how many times Petitioner and Petitioner's trial counsel spoke on the telephone. Petitioner testified that his trial counsel never accepted his telephone calls, and Petitioner's trial counsel testified that he spoke with Petitioner approximately six or seven times. However, it is also clear that Petitioner's trial counsel was aware of Petitioner's defense. Indeed, Petitioner testified that his defense was that he was running a legitimate business, that the checks were forged by Mesker, and that he was simply holding the checks as collateral. This closely mirrors Petitioner's trial counsel's defense that Mesker had access to the checks and suspiciously disappeared prior to the trial. (ECF No. 14-20 at 7 (Petitioner's trial counsel's opening statement: "The evidence is also going to show that Geraldine Mesker had a key to Mr. James Honeyman's mailbox. The evidence is also going to show that Geraldine Mesker was the owner of a duffel bag that was found in a truck that was parked that was full of some of these forged instruments. Interestingly enough, she is on the witness list, but she's not going to testify. We don't know where she is."); *see also* ECF No. 14-22 at 21 (Petitioner's trial counsel's closing statement: "Where is Ms. Mesker? She has the key to Mr. Honeyman's mailbox. Where is she? I don't know. The State doesn't know. And I would ask you to consider that. She's not here, and I wonder why?"); *see also* ECF No. 17-5 at 93 (acknowledgment by Petitioner that his trial counsel questioned the owner of the checks about the fact that Mesker had a key to his mailbox and, thus, access to the checks).)

Petitioner alleges that his trial counsel failed to present the following evidence due to his trial counsel's lack of communication and lack of diligent investigation:

Petitioner's business license, Petitioner's employee, and Officer Cooper's extortion. However, as the Nevada Supreme Court reasonably concluded, Petitioner fails to demonstrate prejudice. First, the presence of a business license does not establish that Petitioner performed any work for Mesker. Second, the record fails to demonstrate what Petitioner's alleged employee would have testified to at the trial if he had been called. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation."). And third, Petitioner's trial counsel testified that he would not "besmirch some person's character without the appropriate backup." (ECF No. 17-17 at 146.) Because Petitioner lacked support for his allegation that Officer Cooper was extorting money from him, it is unlikely that his trial counsel would have questioned Officer Cooper about this allegation even if he had known about it.

Turning finally to Mesker, Petitioner contends that his defense that Mesker forged the checks and owed him money for legitimate work he had performed was supported by various evidence that his trial counsel failed to discover and present: Mesker was originally listed as a subject in the investigation, Mesker paid Petitioner's retainer fee to his initial trial counsel, and Mesker attended portions of the trial. (ECF No. 21-23 at 4 (Officer Brown's incident report listing Mesker as a subject); *see also* ECF No. 17-17 at 80-82, 97 (testimony by Dennis Cameron, Petitioner's initial trial counsel, at the post-conviction hearing that Mesker paid Petitioner's retainer fee and that Mesker told Cameron that she was fearful of being arrested); *see also* ECF No. 18-7 at 12 (testimony of Officer Joseph Lever that Mesker was present outside the courtroom during the trial).) Even if these facts are presumed true, as the Nevada Supreme Court again reasonably concluded, Petitioner cannot establish prejudice. Rather than presenting Mesker as a witness and running the risk that she would fail to testify in accordance with Petitioner's defense, Petitioner's trial counsel testified that he preferred to have Mesker absent from the trial because her lack of appearance "g[a]ve[ him] something to wave around in front of the jury." (ECF No. 17-17 at 143, 160.) Because Petitioner's trial counsel was convinced that Petitioner would be better served by a defense highlighting the fact that

Mesker failed to appear—thereby indicating that she was guilty of the offense and avoiding prosecution—instead of a defense resting on Mesker's uncertain testimony, it cannot be concluded Petitioner's trial counsel would have presented any of this miscellaneous evidence had he known of its existence. As such, Petitioner fails to demonstrate that his trial counsel would have presented a different defense, such that the result of his trial would have been different, if he had discovered or been told about the foregoing information. *See Strickland*, 466 U.S. at 694.

Petitioner is denied habeas relief on Ground One Subpart A.

### 2. Part B

In Ground One Part B, Petitioner alleges that his federal constitutional rights were violated when his trial counsel failed to challenge the State's handwriting expert on authentication grounds. (ECF No. 13 at 26.) Specifically, Petitioner alleges that the State's handwriting expert compared the handwriting on one of the checks to a handwriting sample from Petitioner, but no witness authenticated that sample, making the expert's comparison inadmissible. (*Id.* at 26-27.) Respondents argue that Petitioner failed to provide evidence that the samples were not his, so Petitioner fails to demonstrate either deficiency or prejudice. (ECF No. 76 at 11.)

The Court previously found Ground One Part B to be unexhausted. (ECF No. 56 at 5.) Petitioner moved for a stay and abeyance and filed a third state habeas petition. (ECF Nos. 57, 64-1.) The Nevada Court of Appeals determined that Petitioner's third state habeas petition was untimely and successive and, as such, it was procedurally barred. (ECF No. 64-16 at 2-3.) Petitioner contends that the procedural default should be excused under *Martinez* because he received ineffective assistance of post-conviction counsel. (ECF No. 78 at 18, 24.)

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also McCleskey v. Zant*, 499 U.S. 467, 497 (1991) ("For cause to exist, the external impediment . . . must have

prevented [the] petitioner from raising the claim."); *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) ("To establish prejudice resulting from a procedural default, a habeas petitioner bears 'the burden of showing not merely that the errors [complained of] constituted a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension.") (citing *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphases in original). In *Martinez*, the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause to overcome the procedural default of a claim of ineffective assistance of trial counsel. *See* 566 U.S. 1 (2012). The Supreme Court noted that it had previously held, in *Coleman*, that "an attorney's negligence in a postconviction proceeding does not establish cause" to excuse a procedural default. *Id.* at 1319. The *Martinez* Court, however, "qualif[ied] *Coleman* by recognizing a narrow exception: [i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 1315. The Court described "initial-review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance of trial." *Id.* Because the *Martinez* analysis is intertwined with the underlying merits of this ground, the Court deferred ruling on the *Martinez* issue until the merits of this ground was briefed by the parties. (ECF No. 74 at 8.) The Court now determines that this ground is not substantial and is without merit.

Sean Espley, a forensic document examiner, testified at the trial that he "receive[d] a known handwriting sample to be known of [Petitioner]." (ECF No. 14-22 at 8-9.) Specifically, Espley received "known writings from [Petitioner:] a [copy of a] two-page letter, . . . a copy of an envelope, and two County of Washoe forms." (*Id.* at 9.) Espley determined that Petitioner "probably authored the hand printing on" one of the checks. (*Id.* at 11.) Espley explained that "by saying this person probably authored something, we're saying that no one else could have probably authored this in the world." (*Id.*) Espley further elaborated his definition of "probably": "the sun will probably

rise tomorrow, but there's a very minimal chance it won't; you will probably get up tomorrow morning, there's a minimal chance you won't." (*Id.*) Espley was not able to compare the handwriting on the other two checks because they "contained a handwriting or cursive-style writing, and that was not comparable to the hand printing that was submitted for comparison." (*Id.* at 12.) However, Espley did determine that "the maker's signatures of James Honeyman [on all three checks] were all probably written by the same person." (*Id.* at 10.) Later, during the State's closing argument, it cited Espley's testimony in arguing that it had proven all the elements of the crime beyond a reasonable doubt:

> The next element is we have to show that the defendant knew that they were false or forged documents. Well, ladies and gentlemen, you heard the testimony of Mr. Espley today. Mr. Espley told you that based on his comparison of a known handwriting sample of Mr. O'Neill, he can come to a conclusion, as strong as his conclusion that the sun will rise tomorrow, that the defendant wrote check number 40827. You saw the exhibit he brought it. You saw the comparisons from the known writing and writing on the check. The other thing the expert was able to testify to is that although he couldn't clearly show that the defendant wrote check number 40826 and 40825, because it was in cursive and he didn't have a cursive sample, he can tell you that again, with the same conviction he knows the sun will rise tomorrow that the same person did the signature line of each of these checks. So he can tell you that the defendant wrote one of the checks and he can tell you that the same person signed all three of them. Ladies and gentlemen, he forged them. Of course he knew that they were forged because he's the one who did it. Ladies and gentlemen, we proved that element beyond a reasonable doubt."

(*Id.* at 20.)

NRS § 52.045 provides that "[c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated is sufficient for authentication." Thus, Petitioner's handwriting samples must have been authenticated in order for them to be used for comparison purposes with the checks. With regard to authenticating Petitioner's handwriting samples, NRS § 52.025 provides that "[t]he testimony of a witness is sufficient for authentication or identification if the witness has personal knowledge that a matter is what it is claimed to be," and NRS § 52.015(1)

15

provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence or other showing sufficient to support a finding that the matter in question is what its proponent claims."

Although he does not explain where or how he obtained the samples, Espley definitively testified that he "receive[d] a known handwriting sample to be known of [Petitioner]." (ECF No. 14-22 at 8-9.) Indeed, based on this testimony, it could be the case that Espley had personal knowledge that the samples contained Petitioner's handwriting such that NRS § 52.025 would be satisfied. Further, due to the nature of the samples—a letter, an envelope, and two forms—it is likely that Petitioner's name and information were contained in the samples "to support a finding that the matter in question is what its proponent claims." NRS § 52.015(1). This is supported by Petitioner's trial counsel's apparent acknowledgment during his cross-examination of Espley that the samples were written by Petitioner. (ECF No. 14-22 at 13 (asking Espley whether he "analyze[d] a two or three-page document written by [Petitioner]").) Accordingly, because Petitioner cannot demonstrate that the handwriting samples would have been excluded for lack of sufficient authentication—thereby resulting in a different result at trial if his trial counsel had challenged them—Petitioner cannot demonstrate prejudice. *See Strickland*, 466 U.S. at 694; *see also, e.g.*, *Archanian v. State*, 145 P.3d 1008, 1016-17 (2006) (upholding the admission of a surveillance video, in part, because the defendant failed to demonstrate any evidence bringing the video's authenticity into question).

Because Petitioner has not shown prejudice resulting from his trial counsel's alleged failure in failing to challenge the State's handwriting expert on authentication grounds, Ground One Subpart B is not substantial. Therefore, Petitioner has not shown that his post-conviction counsel was ineffective for failing to raise this ground. And because Petitioner's post-conviction counsel was not ineffective, there is no cause for Petitioner's procedural default. *See Martinez*, 566 U.S. at 9 ("Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's

procedural default of a claim of ineffective assistance at trial."). Ground One Part B is denied because it is procedurally defaulted.

### 3. Part C

In Ground One Part C, Petitioner alleges that his federal constitutional rights were violated when his trial counsel failed to move to suppress—and later to object to—the admission of the evidence seized during his parole officer's search of his person and vehicle. (ECF No. 13 at 29.) Petitioner explains that before he had even been given a drug test, he was improperly arrested and searched based solely upon Officer Cooper's concern about whether he had used controlled substances. (*Id.*) In addition to there being no probable cause for his arrest, Petitioner contends there was not reasonable suspicion to conduct the search pursuant to his parole agreement. (ECF No. 78 at 32.) Further, Petitioner explains that even if there had been reasonable cause to search him, there was no specific authorization for the search of the closed duffel bag in his vehicle. (ECF No. 13 at 30-31.) Respondents argue that pursuant to Petitioner's parole agreement, the officers possessed reasonable suspicion to detain and search Petitioner based upon his conduct in the casino before the detention and the fact that he attempted to evade the parole officers. (ECF No. 76 at 13.) Petitioner rebuts that there was nothing in the arrest report indicating that the officers had a separate basis upon which to arrest Petitioner. (ECF No. 78 at 30.)

In Petitioner's first state habeas appeal, the Nevada Supreme Court held:

> [Petitioner] argues that counsel was ineffective for failing to file a timely motion to suppress the evidence gathered as a result of the probation officers' search of [Petitioner]'s person and vehicle. [Petitioner] failed to demonstrate prejudice because he failed to show that his suppression claim was meritorious. *Kirksey v. State*, 112 Nev. 980, 990, 923 P.2d 1102, 1109 (1996). [Petitioner] did not dispute the terms of his parole included in-person reporting or warrantless search and seizure upon suspicion of a parole violation, nor did he challenge the constitutionality of such conditions. Rather, [Petitioner] contended that his parole officer had [Petitioner] seized and searched only because [Petitioner] had failed to meet the parole officer's extortion demands and that [Petitioner] was otherwise in compliance with his parole agreement so that no warrantless search and seizure was justified. The district court found that [Petitioner] failed to

present credible evidence of extortion, that Officer Summers' testimony established that [Petitioner] was in violation of his parole agreement, and that the officer was more credible than [Petitioner]. Because [Petitioner] did not prove the facts underlying his claim by a preponderance of the evidence, we conclude that the district court did not err in denying this claim.

(ECF No. 21-5 at 3.) The Nevada Supreme Court's rejection of Petitioner's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established federal law.

In Officer Joseph Lever's arrest report, which was prepared the day after Petitioner was arrested on September 23, 2004, he indicated that he observed Petitioner "walking in the area of 5th and Washington" on September 22, 2004, and detained Petitioner based on an "advise[ment] by Officer Cooper with the Nevada Department of Parole and Probation that [Petitioner] was wanted for a Parole Violation." (ECF No. 21-20 at 3.) Similarly, Officer Cooper's parole violation report, which was prepared two days after Petitioner's arrest on September 24, 2004, provided the following:

[Petitioner] was scheduled to report in person to the Division of Parole and Probation on September 9, 2004. The subject did not appear for the scheduled appointment, but called the undersigned officer's voice mail and let a message stating that he would report Friday, September 17, 2004, at 4:30 p.m. [Petitioner] failed to appear for his set appointment of September 17, 2004, at 4:30 p.m. That evening, [Petitioner] called the undersigned officer's voice mail and left a message stating that he would report on Tuesday, September 21, 2004, at 1:00 p.m. However, on Tuesday, September 21, 2004, prior to his appointment, [Petitioner] called the Division stating that his vehicle had broken down and he would not be able to attend his scheduled appointment, and instead, requested to change his appointment to September 28, 2004, at 1:00 p.m.

Due to the fact that [Petitioner] was believed to be presenting a pattern of avoiding the Division, the Division became concerned with [Petitioner]'s activities and whether or not he had relapsed into the use of controlled substances.

On Wednesday, September 22, 2004, the Division received information that [Petitioner] was in the downtown Reno area, and the Division proceeded to make contact with [Petitioner] in order to obtain a drug test. Officers of the Division responded to the Silver Legacy Hotel and Casino, which was [Petitioner]'s reported location. Upon the officers entering the casino, [Petitioner] was observed getting up and moving rather quickly in the opposite direction of the officers. The officers followed, but were unable to

locate [Petitioner]. A short while later [Petitioner] was stopped by the Reno Police Department near the Gold Dust West Casino in Reno.

(ECF No. 21-21 at 2-3.)

Following opening arguments, Petitioner's trial counsel made an oral motion to suppress the evidence found on Petitioner's person and in his vehicle. (ECF No. 14-20 at 7.) The state district court then ruled as follows:

> Well, since this is coming at a late time, but it is, you know, an important issue when it comes to the admissibility of evidence, or an important feature of whether the State proves its case, I think – I'm not going to postpone the trial. You know, I mean I would note that it's out of time based on 174.165, which provides that these motions are to be made not less than – with not less than three days notice to the opposing party unless good cause is shown.
>
> You know, this is certainly something that you know, has to be considered with regard to the legality of the search and seizure. And what I'd ask for you to do is perhaps makes a copy of that case for myself and [the State]. And I would, in essence, deny the motion at this time because it's out of time. But should it appear that there would have been an illegal seizure or search, you know, we can certainly take care of it, you know, as the evidence comes forward at trial. It's certainly something that I think we all ought to know what this authority is and how it might relate to somebody on probation.

(*Id.* at 8.) As the trial progressed, Petitioner's trial counsel did not object to the admission of the checks that were found in his pocket, the yellow pages that were found in his pocket, or the checks that were found in his vehicle. (*See id.* at 10-11.)

Later, at Petitioner's post-conviction evidentiary hearing, Parole Officer Adam Summers testified that he and his partner, Officer Cooper, wanted to located Petitioner on September 22, 2004, for various reasons:

> He had changed his office visit appointment a couple of times. He was being surveilled by both us and the Repeat Offender Program. He had given us different stories as to why he couldn't report to the office, and one of those was he couldn't get there because his truck was broken down. And then we got information that he was actually downtown just a few blocks away from the office.

(ECF No. 18-7 at 32-33.) Officer Summers testified that based on these facts, Petitioner "could be [in violation of his parole agreement] if [the parole officers] believe that he was trying to avoid coming into our office." (*Id.* at 34.) Officer Summers saw Petitioner in a casino playing a slot or video poker machine, and when Petitioner saw the officers, "he got up and headed the opposite direction." (*Id.*) After losing Petitioner in the casino, Officer Cooper received a call from a detective "saying that [Petitioner] was running down Fifth Street towards Gold Dust West, which [was where] his car was parked." (*Id.* at 34-35.) Officer Summers testified that he believed that Petition was in violation of his parole because he "perceived that [Petitioner] was running from [the officers] and [the officers] had information from the detectives he was actually running towards his car," which resulted in Officer Summers' "belie[f] he was attempting to allude [sic] us to avoid supervision." (*Id.* at 37.)

Although Petitioner's trial counsel failed to timely move for the suppression of the evidence, *see* NRS § 174.125(1), (3)(a) (requiring "[a]ll motions in a criminal prosecution to suppress evidence" to be made "in writing not less than 15 days before the date set for trial"), this Court declines to address Petitioner's trial counsel's alleged deficiency because the Nevada Supreme Court reasonably denied Petitioner's claim on the basis that Petitioner failed to demonstrate prejudice. *See Strickland*, 466 U.S. at 697 (explaining that a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other).

Petitioner's parole agreement provided that he "shall submit to a search of [his] person, automobile, or place of residence, by a Parole Officer, at any time of the day or night without a warrant, upon reasonable cause as ascertained by the Parole Officer." (ECF No. 22-7 at 2.) Officer Summers testified that he believed Petitioner acted in violation of the parole agreement when he headed in the opposition direction after seeing the parole officers in the casino and then was seen running down the street towards the location of his vehicle. (ECF No. 18-7 at 34-35.) Officer Summers testified

that this conduct led to his "belie[f that Petitioner] was attempting to allude [sic] [the parole officers] to avoid supervision." (*Id.* at 37.) Therefore, even though Petitioner was detained by the detectives based solely on Officer Cooper's request (ECF No. 21-20 at 3), Petitioner was later searched by his parole officer based on his failure to report to the division for almost two weeks and his conduct in evading the parole officers when he saw them in the casino. (ECF No. 21-21 at 2-3; ECF No. 18-7 at 34-35.) This conduct belies Petitioner's contention that he was searched based solely upon his parole officer's concern about whether he had used controlled substances. Accordingly, the Nevada Supreme Court's conclusion that Officer Summers' testimony demonstrated that Petitioner violated his parole agreement such that a suppression motion would not have been meritorious was reasonable. *See Kimmelman v. Morrison*, 477 U.S. 365, 375, 385 (1986) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonably probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."); *Strickland*, 466 U.S. at 694 (requiring the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

Petitioner is denied habeas relief on Ground One Subpart C.

**B.    Ground Two**

In Ground Two, Petitioner alleges that his federal constitutional rights were violated when the State failed to disclose exculpatory, material evidence. (ECF No. 13 at 33.) Specifically, Petitioner explains that the Division of Parole and Probation sent a letter to the Washoe County District Attorney advising that an investigation was being conducted against Officer Cooper. (*Id.* at 33-34.) The disclosure of this letter and the underlying investigation of Officer Cooper was not revealed to Petitioner until after his direct appeal opening brief was filed. (*Id.* at 34.) Petitioner contends that this information was material because it was highly compelling and demonstrated that Officer Cooper,

the State's primary witness, was not credible. (*Id.*) Respondents argue that the evidence was not material because other witnesses corroborated Officer Cooper's search and recovery of the evidence. (ECF No. 76 at 15.)

In Petitioner's appeal of the denial of his motion for a new trial, the Nevada Supreme Court held:

> A *Brady* violation has three components: "the evidence at issue is favorable to the accused; the evidence was withheld by the [S]tate, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material." The State concedes that the first two prongs establishing a *Brady* violation have been met because the evidence is favorable to [Petitioner] as impeachment evidence and the evidence was withheld from him. The State argues, however, that [Petitioner]'s claim fails on the third prong—prejudice.
>
> After reviewing the record, we conclude that [Petitioner]'s *Brady* claim lacks merit as [Petitioner] has not shown that he was prejudiced by the absence of the challenged evidence. Although the withheld evidence relates to Officer Cooper's credibility, [Petitioner] fails to demonstrate that the absence of the evidence prejudiced him in light of the other evidence produced at trial establishing his guilt. In particular, Detective Michael Brown testified that he observed Officer Cooper recover two of the forged checks from [Petitioner]'s person. In addition, Officer Adam Summers testified that he searched O'Neill's vehicle and found the other forged check. Based on this evidence, even without Officer Cooper's testimony, substantial evidence existed to convict [Petitioner]. Therefore, [Petitioner] has not shown that the evidence was material.
>
> [Petitioner] also contends that the withheld evidence would have undermined the basis for the search. [Petitioner] argues that the false report mentioned in the letter was the basis for the search conducted by Officer Cooper, which resulted in the recovery of the forged checks. To bolster this claim, an affidavit from [Petitioner] alleges that Officer Cooper was extorting money from him. [Petitioner] claims that the only reason Officer Cooper ordered his detention was because he failed to pay Officer Cooper the money requested as part of the extortion scheme. However, there is no indication in the letter or in the record that the reason Officer Cooper ordered [Petitioner] detained was based on a false report, or when the false report was made in relation to the search. Moreover, the letter states that Officer Cooper falsely reported a negative urinalysis test, not a positive test. A negative test would not provide Officer Cooper with a reason to detain and search [Petitioner]. In addition, the allegations made by [Petitioner] regarding the extortion scheme were never presented to the district court prior to the motion for a new trial. The district court found that these allegations, in the letter and in the affidavit, would have merely been used to discredit Officer Cooper and therefore, in light of the substantial evidence

presented at trial, the evidence would not have altered the jury's verdict. We agree and conclude that [Petitioner] has failed to show that the withheld evidence was material.

(ECF No. 22-5 at 4-6 (internal footnote omitted).) The Nevada Supreme Court's rejection of Petitioner's *Brady* claim was neither contrary to nor an unreasonable application of clearly established federal law.

Detective Michael Brown testified at Petitioner's trial that he and Detective Lever had been surveilling Petitioner on September 22, 2004 and detained him at the request of Officer Cooper. (ECF No. 14-20 at 9, 11.) Detective Brown notified Officer Cooper about Petitioner's detainment, and Officers Cooper and Summers arrived at the scene. (*Id.* at 9.) Detective Brown then observed Officer Cooper search Petitioner's person. (*Id.* at 10.) Following that search, Officer Cooper gave Detective Brown "two Capital One bank checks and some phone book pages [of check-cashing businesses within Washoe County] from [Petitioner]'s pocket." (*Id.*) James Honeyman was listed on the checks as the owner of the account. (*Id.*)

Similarly, Officer Cooper testified that he notified the Reno Police Department of his interest in locating Petitioner. (*Id.* at 12.) He was later notified by Detective Brown that Petitioner had been detained in the downtown area, so he went to that location with Officer Summers. (*Id.* at 12-13.) Officer Cooper searched Petitioner and "found in his pocket, his front left pants pocket, some checks and some pages ripped out of the phone book, yellow pages." (*Id.* at 13.) Officer Cooper testified that Petitioner "said he received the checks as payment for work he had done for the individual and that they were his collateral." (*Id.* at 14.) Officer Summers testified that he searched Petitioner's vehicle at the scene and "located an envelope that had two sets of what appeared to be credit card checks" inside of a duffel bag on the floor "in the passenger compartment of the truck." (*Id.* at 15-17.)

Honeyman testified that Capital One would periodically send him preprinted checks with his monthly statement. (*Id.* at 19-20.) Honeyman testified that he did not write the checks found in Petitioner's pockets, did not pay anyone with those checks,

and, specifically, did not pay Petitioner with those checks for any work he had done. (*Id.* at 20.)

Following the trial and the filing of Petitioner's direct appeal opening brief (ECF No. 15-29 at 13), Petitioner received a copy of a letter, dated August 8, 2005, from Amy Wright, the Chief of the Division of Parole and Probation, to Richard Gammick, Washoe County District Attorney. (ECF No. 21-29 at 2.) That letter provided the following:

> [D]uring a recent internal affairs investigation of a Department of Public Safety, Division of Parole and Probation employee, an allegation of dishonesty was sustained against the Parole and Probation officer. The sustained dishonesty allegation involved a report from the officer that a parolee, being supervised by the officer, provided a urine sample that tested negative for controlled substances. Through the investigation, it was determined that the officer did not receive a urine sample from the parolee for testing as reported by the officer.
>
> The administrative investigation has been completed, therefore, we are providing you with this information as it may affect the credibility of a witness in a case being prosecuted by your office. The officer will have the right to contest the validity of the allegation through an independent hearing officer. This independent review has not taken place at this point.
>
> I have been informed that this officer was a witness in a criminal trial against the parolee, which resulted in a conviction. The former parolee's name is Christopher O'Neill. The probation officer's name is Brent Cooper. The Department has provided this information to your Office in order to permit you to determine if the information must be disclosed to the defendant under applicable law.

(*Id.*) This letter formed the basis for Petitioner's motion for a new trial. (ECF No. 15-29.) Petitioner's motion for a new trial also alleged that Officer Cooper was extorting money from Petitioner. (*Id.* at 6.) In support of this allegation, Petitioner attached a declaration to his motion, which provided the following:

> The entire reason for my detention on September 22, 2004, was so that the parole officer could collect money from me or punish me and fulfill threats made for my failure to continue payments to him. There was no other reason or purpose for detaining me. I was not wanted by any law enforcement or the parole department for any violation of laws or parole conditions.

(*Id.* at 14.)

24

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Because a witness's "'reliability . . . may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists. *See Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' of a different result [exists] when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).

To be sure, the undisclosed letter and investigation of Officer Cooper would have created substantial credibility issues for Officer Cooper at trial. However, as the Nevada Supreme Court reasonably concluded, Petitioner fails to demonstrate prejudice. Officer Cooper's trial testimony was fairly succinct: he notified the Reno Police Department that he was seeking Petitioner, he searched Petitioner after being notified that he was detained, and he testified that Petitioner said the checks were payment for work he had done. (ECF No. 14-20 at 12-14.) Detective Brown's testimony corroborated much of Officer's Cooper testimony and, in fact, he testified that he actually observed Officer Cooper's search of Petitioner and recovery of the two checks from Petitioner's pocket. (*Id.* at 10.) Moreover, Officer Summers testified that he located the third check during

his search of Petitioner's vehicle. (*Id.* at 15-17.) Therefore, even if Officer Cooper's testimony had been impeached, the jury would have still heard testimony from other witnesses that Petitioner possessed the three checks. Accordingly, as the Nevada Supreme Court reasonably held, substantial evidence was presented to convict Petitioner even if Officer Cooper's testimony had been fully discredited. Thus, Petitioner cannot demonstrate that the withheld evidence was material because there was not "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

Petitioner also contends that the undisclosed letter could have been used to move to suppress all the recovered evidence based on the fact that the detention and search of Petitioner and his vehicle was based on Officer Cooper's justification for the stop, which was suspect due to his credibility issues. (ECF Nos. 13 at 35, 78 at 41-42.) Petitioner elaborates that the extortion scheme evidence could also have been presented in this motion, as the undisclosed letter supported Petitioner's allegation that Officer Cooper sought Petitioner's detention that day because Petitioner did not accede to Officer Cooper's extortion demands. (ECF No. 78 at 36, 40.) The Nevada Supreme Court reasonably denied this argument finding that there was no indication in the record regarding the reason Officer Cooper detained Petitioner on September 22, 2004. Because the record before the Nevada Supreme Court at the time it affirmed the denial of Petitioner's motion for a new trial failed to demonstrate the basis for the detention of Petitioner, the Nevada Supreme Court reasonably determined that Petitioner failed to demonstrate that the undisclosed evidence was material. Indeed, without a basis for the detention, Petitioner cannot demonstrate "a reasonable probability that, had the" letter and investigation been disclosed, a motion to suppress the evidence based on an argument that the justification for the detention was suspect would have been successful. *Bagley*, 473 U.S. at 682.

Petitioner is denied habeas relief on Ground Two.[1]

## C.    Ground Three

In Ground Three, Petitioner alleges that his federal constitutional rights were violated when the state district court failed to conduct an appropriate inquiry into his motion to replace existing appointed counsel with new appointed counsel. (ECF No. 13 at 36.) Petitioner elaborates that he made a good faith, timely effort to communicate to the state district court that an irreconcilable conflict existed between him and his trial counsel. (*Id.* at 39.) Respondents argue that the record fails to reflect that there was a total breakdown of Petitioner's relationship with his trial counsel. (ECF No. 76 at 19.)

Petitioner raised this issue in his opening brief of his appeal of the denial of his first state habeas petition. (ECF No. 20-1 at 31-36.) However, the Nevada Supreme Court's order affirming the denial of Petitioner's first state habeas petition is silent as to the disposition of this claim.[2] (ECF No. 21-5.) 28 U.S.C. § 2254(d) generally applies to unexplained as well as reasoned state-court decisions: "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are

---

[1]The Court is restricted from considering evidence that was not a part of the record reviewed by the Nevada Supreme Court at the time it ruled on the issue. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Accordingly, the Court did not consider, as a part of Ground Two, the testimony from the post-conviction evidentiary hearing or other evidence cited by Petitioner that occurred after the Nevada Supreme Court's affirmation of the denial of Petitioner's motion for a new trial.

[2]The Court previously found Ground Three to be exhausted "in light of the inherent difficulty in separating a claim of conflict of counsel with a claim of ineffective assistance of counsel." (ECF No. 56 at 7.)

inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Id.* at 102; *see also Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits.").

On January 26, 2005, the state district court appointed counsel for Petitioner. (ECF No. 14-10 at 2.) On or about May 5, 2005, Petitioner attempted to move for the withdrawal of his trial counsel and for his trial counsel to transfer his records to Petitioner. (ECF No. 14-15.) Petitioner explained that he "wishe[d] to terminate [his] counsel for" various reasons:

> counsel has refused to accept or talk to [Petitioner] by phone, counsel has refused to visit with [Petitioner], counsel has refused to answer letters to [Petitioner], counsel has not filed any motions or done any investigations per [Petitioner]'s request, counsel informed [Petitioner] in court that he could not afford to see [Petitioner] or speak to him by phone and stated that he would not respond to [Petitioner]'s letters because [Petitioner]'s case is not important.

(*Id.* at 3-4.) The motion does not contain a file stamp, and the envelope included with the motion was addressed to Petitioner's trial counsel, not the state district court. (*See id.* at 2, 5.) On the same day, May 5, 2005, Petitioner also mailed a request to his trial counsel terminating his representation. (ECF No. 21-24.) On May 10, 2005, Petitioner's trial counsel sent Petitioner a letter indicating that he could not "be removed as [he] was appointed by the court" and informing Petitioner that he could "hire a private attorney or [he could] choose to represent" himself. (ECF No. 21-26 at 2.) Petitioner's trial counsel also advised that "[t]his issue will need to be addressed in court at your Motion to Confirm Hearing set for June 2, 2005." (*Id.*)

At the Motion to Confirm Trial hearing held on June 2, 2005, four days before the trial commenced, the state district court indicated that "it's been represented to [it] that [Petitioner] may wish to go through this trial representing" himself. (ECF No. 14-19 at 2, 3.) Petitioner stated that that was inaccurate and explained the following:

> I sent a motion to the Court a month ago for withdrawal of counsel and requested appointment of new counsel. The reasoning is that I've never had a chance to talk with [trial counsel]. He won't talk to me about my case, pure and simple. I've seen him in court. He said he would come see me. He didn't.

(*Id.* at 3.) Petitioner's trial counsel then indicated that he was "prepared to proceed to trial." (*Id.* at 4.) The state district court clarified that Petitioner "d[id]n't want to represent [him]self," to which Petitioner responded:

> I would like counsel to represent me. I finally was able, after calling his office about 20 times, I finally had my family call his office and please ask him to call me. He said no, if you want to make calls to the attorney you would have to pay. They started the new policy at the prison to pay for phone calls. I ordered some cards and used 20 or $30 worth talking to the secretary and asking when he would be in, when he will come to see me, that I had motions to file on this case and far as I know there hasn't been any motion filed, nothing done. Nobody talked to me. I don't know how it is possible to be ready for trial Monday without speaking to me. I just don't understand it.

(*Id.* at 5.)

Thereafter, the state district court found that Petitioner's trial counsel would continue as counsel and Petitioner expressed his dissatisfaction with that finding:

> THE COURT: . . . Since, [Petitioner], you don't want to be self-represented, we'll go forward with [trial counsel] as your counsel. You may not like him that much but as long as he's ready to go, he's a very astute professional defense counsel and I'm satisfied that you will be well represented."
>
> THE DEFENDANT: I feel then I'm forced to represent myself, because, as I said, I repeatedly requested through his office to file motions, to contact witnesses for my behalf and subpoena those witnesses. So far he hasn't done any of that. I know he never filed the motion unless I never got a copy of it. I guess I'm forced to represent myself then.
>
> THE COURT: Well, you will not be forced to represent yourself but we'll go forward then with the trial on Monday and [trial counsel], you are still of counsel.
>
> . . .

THE DEFENDANT: So I can't represent myself or have new counsel?

THE COURT: Well, you are not willfully going to represent yourself. [Trial counsel] is your appointed counsel.

THE DEFENDANT: Then I would like to willfully like to represent myself, willfully because - -

THE COURT: No, I don't think we're going there. [Trial counsel], you'll be here Monday morning then.

(*Id.* at 6-8.)

Before the jury selection process commenced on the first day of trial, the state district court revisited the issue: "I didn't want you to go with [trial counsel] or excuse him and go self-represented after you had told me that – you initially didn't want to be self-represented, you just wanted another lawyer. And today, what do you want to do?" (ECF No. 14-20 at 5-6.) Petitioner responded that he would "stand by [the] argument [he] made Thursday." (*Id.* at 6.) The state district court then indicated, "it sounds like you are well represented by [trial counsel] at this point. So I think we can proceed." (*Id.*)

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Although the Sixth Amendment does not "guarantee[ ] a 'meaningful relationship' between an accused and his counsel," *Morris v. Slappy*, 461 U.S. 1, 14 (1983), "compel[ling] one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970). When a state district court denies a request for substitute counsel, this "court must consider: (1) the extent of the conflict; (2) whether the trial judge made an appropriate inquiry into the extent of the conflict; and (3) the timeliness of the motion to substitute counsel." *Daniels v. Woodford*, 428 F.3d 1181, 1197-98 (9th Cir. 2005). "[T]he ultimate constitutional question," therefore, asks

whether the state district court "violated [Petitioner's] constitutional rights in that the conflict between [Petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000).

Turning first to the extent of the conflict, as was detailed in Ground One Part A, Petitioner testified at the post-conviction hearing that his trial counsel would not accept his telephone calls, failed to answer his letters, only visited him in the jail once three days before the trial commenced, and would "shush" him during pretrial hearings. (ECF No. 17-5 at 22-23, 49, 92.) Contrarily, Petitioner's trial counsel testified at the post-conviction evidentiary hearing that he believed he spoke with Petitioner six or seven times, excluding court appearances, before his visit to the jail three days before trial. (ECF No. 17-17 at 136, 150, 153, 162.) Although the level of communication between Petitioner and his trial counsel may have been low, Petitioner and his trial counsel were able to converse—albeit in a limited fashion—during the three or four pretrial hearings, once in person, through letters sent by Petitioner, and during an unclear number of times by telephone. Petitioner alleges that these conversations were insufficient to adequately advise his trial counsel of his defense and evidence supporting his defense. However, as was assessed in Ground One Part A, Petitioner's trial counsel did present a defense deflecting guilt onto Mesker. Because Petitioner and his trial counsel did converse about the case such that they were on the same page with presenting a defense aimed at pointing the finger at Mesker, it cannot be concluded that the extent of the conflict between Petitioner and his trial counsel rose to a level that would cause concern. *See Schell*, 218 F.3d at 1026 (explaining that a petitioner's Sixth Amendment right to counsel is violated when a "conflict between [Petitioner] and his attorney . . . result[s] in a total lack of communication").

Turning next to the state district court's inquiry into Petitioner's request, Petitioner explained to the state district court that his trial counsel had not spoken to him about his

31

case, had not come to visit him, and had not filed any motions. (ECF No. 14-19 at 3, 5.) Although the state district court did not inquire about Petitioner's alleged conflict, Petitioner volunteered the relevant information underlying the conflict. Because the state district court had adequate information in order to make a determination regarding Petitioner's request, it cannot be determined that the state district court's inquiry was unduly troublesome. *See United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986) ("While the trial judge might have made a more thorough inquiry into the substance of McClendon's alleged conflict with counsel, McClendon's description of the problem and the judge's own observations provided a sufficient basis for reaching an informed decision. Thus, the district court's failure to conduct a formal inquiry was not fatal error.")

Turning finally to the timing of Petitioner's request, it appears that Petitioner attempted to move for the withdrawal of his trial counsel and the appointment of new counsel approximately a month before his trial began. (ECF No. 14-15.) However, importantly, the motion does not contain a file stamp, so it is unclear whether Petitioner filed the motion or simply mailed a copy of the motion to his counsel. It was not until June 2, 2005, four days before the trial commenced, that Petitioner told the state district court that he would like new counsel. (ECF No. 14-19 at 3, 7.) Because Petitioner's request for new counsel was made so close to the start of the trial, it cannot be concluded that that the state district court abused its discretion in denying the request. *See McClendon*, 782 F.2d at 789 (determining that if a defendant moves for substitution of counsel, a state district court may exercise its discretion and deny that motion if it would require a continuance of the trial date).

After considering the foregoing factors, it cannot be concluded that "the conflict between [Petitioner] and his attorney . . . resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000). Because the Court determines that fairminded jurists would agree that this reasoning establishing that Petitioner's federal constitutional rights were not

violated was not inconsistent with prior decisions of the United States Supreme Court, *Harrington*, 562 U.S. at 102, Petitioner is not entitled to relief on Ground Three.

### D.    Ground Four

In Ground Four, Petitioner alleges that his federal constitutional rights were violated when the state district court failed to hold a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975) after he requested to represent himself. (ECF No. 13 at 39, 42.) Petitioner explains that the totality of the circumstances show that his waiver of counsel would have been voluntary and knowing, that there was no indication that his request was an attempt to delay the trial, and the lateness of his request was his trial counsel's fault. (ECF No. 78 at 54-55.)

In Petitioner's direct appeal, the Nevada Supreme Court held:

[Petitioner] contends that the district court violated his right to self-representation when it refused to permit [Petitioner] to represent himself, or even canvass [Petitioner] pursuant to *Faretta v. California*. [Footnote 29: 422 U.S. 806 (1975).] "A criminal defendant has an 'unqualified right' to represent himself at trial so long as his waiver of counsel is intelligent and voluntary." [Footnote 30: *Tanksley v. State*, 113 Nev. 997, 1000, 946 P.2d 148, 150 (1997).] "Denial of that right is per se reversible error." [Footnote 31: *Hymon v. State*, 121 Nev. 200, 212, 111 P.3d 1092, 1105 (2005) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)).] "[B]efore allowing a defendant to waive counsel and represent himself, the trial court must ensure that the defendant is competent and that the waiver of counsel is knowing, voluntary, and intelligent." [Footnote 32: *Id.*] "The court should conduct a *Faretta* canvass to apprise 'the defendant fully of the risks of self-representation and of the nature of the charged crime so that the defendant's decision is made with a "clear comprehension of the attendant risks.""" [Footnote 33: *Id.* (quoting *Johnson v. State*, 117 Nev. 153, 164, 17 P.3d 1008, 1016 (2001) (citing *Tanksley v. State*, 113 Nev. 997, 1001, 946 P.2d 148, 150 (1997) (quoting *Graves v. State*, 112 Nev. 118, 124, 912 P.2d 234, 238 (1996)))).]

A district court may, however, deny a defendant's request for self-representation where the "request is untimely, the request is equivocal, the request is made solely for the purpose of delay, the defendant abuses his right by disrupting the judicial process, or the defendant is incompetent to waive his right to counsel." [Footnote 34: *Tanksley*, 113 Nev. at 1001, 946 P.2d at 150.]

Here, the district court failed to specify its rationale for denying [Petitioner]'s request outright without conducting a *Faretta* canvas. Regardless, we conclude that the district court did not err in failing to perform a *Faretta* canvas and denying [Petitioner]'s request because [Petitioner]'s request was untimely. In this, we note that [Petitioner] made his request only three judicial days before the trial date. Had the district court granted [Petitioner]'s request the trial would have been undoubtedly delayed.

The issue remains whether ineffective assistance of counsel forced [Petitioner] to request self-representation. According to [Petitioner]'s statements, as of the Thursday before the Monday trial, [trial counsel] had not yet met with [Petitioner] outside of court proceedings and refused to take [Petitioner]'s telephone calls. If [Petitioner]'s assertions are correct, then he may have a valid claim for ineffective assistance of counsel to be addressed in subsequent habeas proceedings.

(ECF No. 15-22 at 14-15.) The Nevada Supreme Court's rejection of Petitioner's *Faretta* claim was neither contrary to nor an unreasonable application of clearly established federal law.

"[T]he Sixth and Fourteenth Amendments include a 'constitutional right to proceed *without* counsel when' a criminal defendant 'voluntarily and intelligently elects to do so.'" *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (quoting *Faretta*, 422 U.S. at 807) (emphasis in original); *see also Iowa v. Tovar*, 541 U.S. 77, 87-88 (2004) ("While the Constitution 'does not force a lawyer upon a defendant,' . . . it does require that any waiver of the right to counsel be knowing, voluntary, and intelligent.") (internal citation omitted). In order to invoke this right to proceed without counsel, the defendant's request must be timely. *See United States v. McKenna*, 327 F.3d 830, 844 (9th Cir. 2003); *Avila v. Roe*, 298 F.3d 750, 753 (9th Cir. 2002). In *Faretta*, the Supreme Court noted that the defendant's request to represent himself was made "[w]ell before the date of trial" and "weeks before trial." 422 U.S. at 807, 835. The Ninth Circuit later explained that "[b]ecause the Supreme Court has not clearly established when a *Faretta* request is untimely, other courts are free to do so as long as their standards comport with the Supreme Court's holding that a request 'weeks before trial' is timely." *Marshall v. Taylor*, 395 F.3d 1058, 1061 (9th Cir. 2005). Applying this explanation, the Ninth Circuit affirmed the denial of habeas corpus relief to the petitioner finding that "[b]ecause the timing of

[his] request fell well inside the 'weeks before trial' standard for timeliness established by *Faretta*, the court of appeal's finding of untimeliness clearly comports with Supreme Court precedent." *Id.*

As was discussed in Ground Three, Petitioner made his request to represent himself at the Motion to Confirm Trial hearing, which was held on June 2, 2005, a Thursday, before the commencement of the trial on Monday, June 6, 2005. (ECF Nos. 14-19 at 7, 14-20.) The Nevada Supreme Court's holding that the state district court did not err in failing to conduct a *Faretta* canvass because Petitioner's request to represent himself was untimely is not contrary to federal law. A request made four calendar days before trial is significantly less than a request made "weeks before trial," which the Supreme Court has held is timely. *Faretta*, 422 U.S. at 807. Because Petitioner's "request fell well inside the 'weeks before trial' standard for timeliness established by *Faretta*," the Nevada Supreme Court's holding that a request made four calendar days before trial is untimely "clearly comports with Supreme Court precedent," *Marshall*, 395 F.3d at 1061. Petitioner is not entitled to habeas relief for Ground Four.

### E. Ground Six

#### 1. Part A

In Ground Six Part A, Petitioner alleges that his federal constitutional rights were violated due to his improper sentence as a habitual criminal. (ECF No. 13 at 47.) Petitioner elaborates that his six prior non-violent felony convictions should be grouped and found to only constitute two prior convictions, thereby making the larger habitual criminal sentence of life inapplicable. (*Id.* at 48-49.)

This Court previously explained that Petitioner presented this claim in his first state habeas petition but failed to raise it in his appeal of the denial of that petition. (ECF No. 74 at 8 (citing ECF Nos. 15-25 at 7, 15-14).) However, the Court found this claim to be exhausted because Petitioner raised it in his motion to modify or correct his sentence and his appeal of the denial of that motion. (*Id.*) In that appeal, the Nevada Supreme Court held:

In his motion filed on June 25, 2010, appellant claimed that . . . his sentence was based on incorrect assumptions about his criminal record. Appellant failed to demonstrate that his sentence was facially illegal or that the district court lacked jurisdiction. *See Edwards v. State*, 112 Nev. 704, 708, 918 P.2d 321, 324 (1996). Appellant failed to demonstrate that the district court relied on mistaken assumptions regarding his criminal record that worked to his extreme detriment. *See id.* We therefore conclude that the district court did not err in denying appellant's motion.

(ECF No. 20-21 at 2-3.) The Nevada Supreme Court's rejection of this claim was neither contrary to nor an objectively unreasonable application of clearly established federal law.

Following the conclusion of Petitioner's trial, the State filed a notice of intent to seek habitual criminality. (ECF No. 14-27.) The notice outlined Petitioner's previous six felonies:

On March 29, 1993, [Petitioner] was convicted in the Third Judicial District Court of the State of Nevada, of the crime of Attempted Possession of a Stolen Vehicle, a felony under the laws of the State of Nevada.

On August 2, 1993, [Petitioner] was convicted in the Superior Court of the State of California, of the crime of Attempted Sale of Marijuana, a felony under the laws of the situs of the crime or the State of Nevada.

On August 6, 1993, [Petitioner] was convicted in the Second Judicial District Court of the State of Nevada, of the crime of Being Under the Influence of a Controlled Substance, a felony under the laws of the State of Nevada.

On October 10, 1993, [Petitioner] was convicted in the First Judicial District Court of the State of Nevada, of the crime of Escape, a felony under the laws of the State of Nevada.

On December 6, 1993, [Petitioner] was convicted in the Superior Court of the State of California, of the crime of Evading Officer and Causing Death or Serious Bodily Injury, a felony under the laws of the situs of the crime or the State of Nevada.

On April 21, 1995, [Petitioner] was convicted in the Second Judicial District Court of the State of Nevada, of the crime of Robbery with the Use of a Firearm, a felony under the laws of the State of Nevada.

(*Id.* at 3-4.) The state district court admitted certified copies of these prior convictions at Petitioner's sentencing hearing. (ECF No. 15-1 at 6-9; *see also* ECF Nos. 21-8, 21-9, 21-11, 21-12, 21-13, 21-15.)

Petitioner takes issue with his habitual criminal sentence, imposed pursuant to NRS § 207.010(1)(b), which provides that a person who has been convicted of at least three felonies shall be punished "(1) For life without the possibility of parole; (2) For life with the possibility of parole [after] 10 years has been served; or (3) For a definite term of 25 years [after] 10 years has been served." *Cf.* NRS § 207.010(1)(a) (providing that a person who has been convicted of two prior felonies "shall be punished . . . by imprisonment in the state prison for . . . 5 [to] . . . 20 years"). As a threshold matter, Petitioner has failed to identify the "clearly established federal law as determined by the United States Supreme Court" that the Nevada Supreme Court's decision allegedly either was contrary to or unreasonably applied. When there is no clearly established federal law stating a particular standard or rule at the time of the state court decision, then, by definition, a petitioner cannot establish that the state court's decision was either contrary to or an unreasonable application of clearly established federal law under AEDPA. *See, e.g., Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see also Williams v. Taylor*, 529 U.S. 362, 390 (2000) ("The threshold question under AEDPA is whether [Petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final."). Accordingly, Petitioner, who has the burden of proof and persuasion on habeas review, has not established a basis for relief under AEDPA.

Moreover, the Nevada Supreme Court is the final arbiter of Nevada state law. *See Montana v. Wyoming*, 563 U.S. 368, 377 n.5 (2011) ("The highest court of each State, of course, remains 'the final arbiter of what is state law.'") (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940)). The Nevada Supreme Court's rejection of Petitioner's contention that NRS § 207.010 should be applied differently is unquestionable on federal habeas review.

Petitioner is denied habeas relief on Ground 6 Part A.

## 2. Part B

In Ground Six Part B, Petitioner alleges that his federal constitutional rights were violated when the state district court conducted a sentencing analysis that should have been conducted by a jury under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (ECF No. 13 at 49.) In Petitioner's direct appeal, the Nevada Supreme Court held:

> [Petitioner] argues that the district court erred in adjudicating him a habitual criminal pursuant to NRS 207.010 because the district judge rather than a jury found facts in violation of *Apprendi v. New Jersey*. In *Apprendi*, the United States Supreme Court announced that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Four years later in *Blakely v. Washington*, the Court clarified *Apprendi*, stating that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." This means that the "statutory maximum" is "not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings."
>
> The issue before us is whether NRS 207.010 and our holdings respecting its application violate *Apprendi*. NRS 207.010(1)(b) provides that a defendant conviction of a felony who has previously been three times convicted of a felony shall be punished with a term of life in prison with or without the possibility of parole or a definite term of 25 years with the possibility of parole. The statute further provides that "[t]he trial judge may, at his discretion, dismiss a count under this section which is included in any indictment or information."
>
> The plain language of NRS 207.010(2) grants the district court discretion to dismiss a count of habitual criminality, not the discretion to impose such an adjudication based on factors other than prior convictions. Therefore, we conclude that NRS 207.010 on its face does not violate *Apprendi*'s mandate.

(ECF No. 15-22 at 4-7 (internal footnotes omitted).) The Nevada Supreme Court then considered "whether [its] interpretation of the statute has been inconsistent with *Apprendi* and its progeny." (*Id.* at 7.) After analyzing and reviewing *Kaua v. Frank*, 436 F.3d 1057 (9th Cir. 2006) and its prior habitual criminal cases, the Nevada Supreme Court reasoned and concluded as follows:

In light of *Apprendi*, we disapprove any interpretation of our prior case law as suggesting that facts other than prior convictions must be found in order to adjudicate a defendant a habitual criminal. We stress that the "just and proper" determination relates solely to the district court's statutorily granted discretion to dismiss a count of criminal habituality pursuant to NRS 207.010(2). Thus, a district court may consider facts such as a defendant's criminal history, mitigation evidence, victim impact statements and the like in determining whether to dismiss such a count. Accordingly, such facts do not operate to increase the punishment beyond the already established statutory maximum and therefore need not be found by a jury beyond a reasonable doubt. And the plain language of the statute dictates that should the district court elect not to dismiss the count, it must impose a sentence within the range prescribed in NRS 207.010(1). We therefore conclude that neither NRS 207.010 nor our case law interpreting it violates *Apprendi*. Therefore, the district court properly imposed habitual criminal status upon [Petitioner].

(*Id.* at 13-14.) This ruling by the Nevada Supreme Court was not objectively unreasonable.

Before sentencing Petitioner, the state district court commented on Petitioner's prior felony convictions:

I also have to consider the five or six - - I guess it's six felony convictions that the State has submitted a record of. These crimes were committed in 1992 and 1993. It appears that Mr. O'Neill was in prison from '93 to 2004, and it shows a parole in April of 2004, and this offense occurred in September 2004, so there was less than a year out of custody by the time this offense occurred, and the defendant was convicted of three felony counts of possession of a forged instrument.

In reviewing the number of felonies, and I don't believe they're remote in time - - I mean, they are somewhat more than ten years old, but then Mr. O'Neill has been in custody, not able to commit crimes until - - he was released in April of '04, and then he was picked up and charged with these three additional felonies roughly five months after he was released on parole.

It does appear that these are, you know, quite serious, substantial felonies. The nature of some of these, such as robbery with the use of a deadly weapon, certainly are violent crimes. These aren't just paper-pushing matters. This one obviously is more of a paper event, not a violent crime.
I am going to find that the statutory number of prior felonies and their usefulness due to age is appropriate under the statute, and I also find that it is just and proper for the defendant to be punished as an habitual criminal due to his record and the closeness in time of these offenses to the time

that he was actually released from custody on parole, and he certainly poses a danger to society of continued criminal conduct.

Now, with regard to how I treat this, you know, even though Mr. O'Neill is an habitual criminal, these offenses are more of just a monetary theft attempt rather than a violent crime, and, you know, he's already done ten years in prison. I'm reluctant to go as far as the State is requesting to go, life without the possibility of parole.

I think perhaps over the next period of ten years, Mr. O'Neill might, you know, find that living in prison his adult life isn't really what he wants to do and make a better effort than he did this last time to avoid engagement in criminal activities.

So where I'm headed would be life with the possibility of parole after ten years. I think that's the more appropriate way to go given the nature of the current offense and the fact that he certainly is a habitual criminal.

(ECF No. 15-1 at 21-23.)

In *Apprendi*, the United States Supreme Court held, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Petitioner alleges that the above-quoted language from the state district court at his sentencing hearing demonstrates that the state district court made several factual findings justifying his enhanced habitual sentence in violation of *Apprendi*. (ECF No. 78 at 56.) However, the state district court was merely sentencing Petitioner pursuant to NRS § 207.010, which the Ninth Circuit has already concluded does not violate *Apprendi*. *See Tilcock v. Budge*, 538 F.3d 1138, 1144 (9th Cir. 2008).

Petitioner contends that *Tilcock* was undermined by the recent United States Supreme Court's decision in *Hurst v. Florida*, 136 S.Ct. 616 (2016). (ECF No. 78 at 56.) In *Tilcock*, the Ninth Circuit concluded that Nevada's habitual criminal statute does not violate *Apprendi* because "under the terms of the statute, the fact of petitioner's prior convictions alone exposed Petitioner to the statutory maximum of life imprisonment without the possibility of parole. The statute does not require or even authorize additional judicial factfinding to determine whether a defendant is a habitual criminal." 538 F.3d at 1144. In *Hurst*, the United States Supreme Court determined that the defendant's

"sentence violates the Sixth Amendment" because Florida's sentencing statute did "not require the jury to make the critical findings necessary to impose the death penalty. Rather, Florida requires a judge to find these facts." 136 S.Ct. at 622. Petitioner avers that, similar to Florida's statute in *Hurst*, Nevada's habitual criminal statute requires an exercise of discretion. (ECF No. 78 at 57.)

NRS § 207.010(1) provides that "a person convicted in this state of . . . [a]ny felony, who has previously been three times convicted . . . of any crime . . . amount[ing] to a felony . . . is a habitual criminal and shall be punished for a category A felony." Contrary to Petitioner's contention, NRS § 207.010(1) does not require an exercise of discretion regarding a finding that a defendant is a habitual criminal. As the Ninth Circuit explained in *Tilcock*, "[t]he statute does not require or even authorize additional judicial factfinding to determine whether a defendant is a habitual criminal." 538 F.3d at 1144. Indeed, NRS § 207.010(2) provides that "[t]he trial judge may, at his or her discretion, dismiss a count under this section." However, as the Ninth Circuit explained in *Tilcock*, NRS § 207.010(2) makes "[t]he opportunity for leniency by the . . . judge . . . a judgment call, not a factual finding." 538 F.3d at 1144. This is contrary to the Florida statute in *Hurst* that "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify the death penalty." 136 S.Ct. at 619. Accordingly, Petitioner's argument that *Hurst* undermined *Tilcock* is without merit.

Because the Nevada Supreme Court's holding that Petitioner's sentence did not violate *Apprendi* was neither contrary to nor an unreasonable application of clearly established federal law, Petitioner is denied habeas relief on Ground 6 Part B.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

41

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court's procedural ruling was correct. *See id*.

Applying these standards, the Court finds that a certificate of appealability is warranted for Ground One Part A and Ground Two. Regarding Ground One Part A, reasonable jurists could debate whether prejudice ensued from Petitioner's trial counsel's lack of communication with Petitioner and lack of a reasonable investigation. Specifically, Petitioner's trial counsel failed to investigate Petitioner's business, Petitioner's alleged employee, and Mesker. Petitioner's defense centered around the fact that he conducted business with Mesker, and Mesker, who was the roommate of the owner of the checks, gave him the checks as collateral. Evidence that Petitioner had a landscaping business license, that Petitioner had an employee who assisted in the work performed for Mesker, if true, and that Mesker accepted responsibility for forging the checks, if true, could have resulted in a different result at Petitioner's trial.

Regarding Ground Two, although the basis for Petitioner's detention was unknown at the time the Nevada Supreme Court affirmed the denial of Petitioner's motion for a new trial, reasonable jurists could debate whether prejudice ensued from the State's suppression of Officer Cooper's internal investigation. Indeed, because Petitioner was detained at the request of Officer Cooper—regardless of the reason for the detention—and because Officer Cooper was being investigated for dishonesty, the state district court could have granted a request by Petitioner to suppress the evidence found during that detention.

This court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Petitioner's habeas claims on the remaining grounds.

## VI.    CONCLUSION

It is therefore ordered that the First Amended Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 (ECF No. 13) is denied.

It is further ordered that Petitioner is granted a certificate of appealability for Ground One Part A and Ground Two. It is further ordered that a certificate of appealability is denied as to Petitioner's remaining grounds.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 6th day of January 2019.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE